Thank you. We're here under at least a strange procedure, but it worked for our panels last month and it worked with the first argument today. As I advise those lawyers, we're here to get this done as efficiently as possible, so if you have any questions or concerns about the way it's going, just speak up. I've got you both pinned, so that part of the technology seems to have worked and we've been able to hear each other so far. So Ms. Bates, with that almost no introduction, you have the floor. Thank you, Your Honor. May it please the Court, my name is Rachel Bates and I represent the defendant's appellants in this case, Officers Nathaniel Atkinson, Richard White, and Nicholas Jensen, as well as Audrain County. The plaintiff in this case is David Ivey, who is the father of Mark Ivey, who died while he was incarcerated at the Audrain County Jail. We also have co-defendants in this case who are Dr. Brownfoot and Nurse Hilda Rand in Advanced Correctional Health Care, who are the medical providers at Audrain County Jail. What I'd like to focus on today is our second issue on appeal, and that is that the District Court erred in denying qualified immunity to our defendant officers because the undisputed facts failed to establish a constitutional violation. In finding this, the District Court noted two specific facts that precluded some re-judgment as to whether the defendants as a whole, county and medical defendants, were deliberately indifferent to Ivey's medical needs. The first of these facts is entirely irrelevant to this appeal. It's whether the medical exam performed by Nurse Hilda Rand properly assessed Ivey for an asthma issue, or properly assessed his lung function. Again, that's irrelevant to this appeal. The second issue of fact, or the second fact that the officers informed Nurse Hilda Rand as to seizure-like movements that were observed by one of the officers, and the District Court held that was material and precluded some re-judgment. First and foremost, the importance or purported materiality of this fact is based on entirely speculation. The plaintiff uses this fact to advance the notion that if the officers had told Nurse Hilda Rand about these seizure-like movements, then maybe it would have changed Ivey's fate. However, the law of qualified immunity does not allow for hindsight or speculation. Rather, under the controlling case law of the Eighth Circuit and the Supreme Court, qualified immunity requires examination of the particular circumstances that these officers faced at the time of the occurrence. What did the District Court have to say about the question of what would have happened had the medical professionals been informed? I don't know that the District Court necessarily had anything to say about it. They held that it was an issue. I see. I'm sorry to interrupt, but here's the difficulty I see. This is a qualified immunity appeal, and so we have to take the facts as found by the District Court, or as likely assumed by the District Court. Yes, Your Honor. There's no difficulty, so can we assume, what is there in the record about what would have happened had these difficulties been reported to medical professionals? Is there something in there was true? There's nothing in the record except things that are based on speculation and hindsight, so the doctor has testified, well, I might have requested that he go to the emergency room. I might have requested this. The nurse might have acted differently, but these are all based on speculation. There's no solid evidence. Well, the nurse said she'd want, she would want to know that. That was in the facts as described. Yes, Your Honor. The nurse did say that she wanted to know that, but I think the more pertinent fact, the more material fact, is that Ivy was evaluated by a nurse, so I think what would be helpful to put this into a little bit of context is just, there are a plethora of undisputed facts that show that these officers acted and responded to Ivy's medical needs in a timely fashion and in a concerned fashion, and definitely not deliberately indifferent. Ivy was arrested. Now, somebody asked a question here. Are you conceding that the facts, when taken in a light, most favorable to Mr. Ivy show that he did have serious medical needs? I would, no, Your Honor. I would argue that he, I apologize, I would disagree with that. I would argue that he does not have a serious, first and foremost, he has no record of a serious medical need. He has no medical record supporting that, and the medical needs that the officers observed are not so serious that a lay person would also consider them serious. The vomiting, the defecation, the seizures, none of that would put a reasonable person on notice that he had serious medical needs? Well, I think there's a timing issue that needs to be clarified as well. So, prior to Ivy vomiting the first night, he was incarcerated on July 20th at 1239 AM, I apologize, at 332 AM on July 21st, 26 hours later was the first instance of vomiting. It was one instance of vomiting. The officers immediately responded to Ivy and got him cleaned up. Ivy was ambulatory and he was lucid. He declined medical attention. Two hours later, he again vomited and he defecated on himself. And at this instance, Officer White observed what he believed as a lay person to be seizure-like symptoms. Counsel, I thought the vomiting was the night of July 21st, after he checked into the cell shortly after midnight. He was booked by Audren County Jail on July 20th at 1249 AM. Yes, but he didn't get to the jail until midnight July 21, right? No, I would disagree. July 20th at 1249 AM is when he was booked. I believe that's what the booking records reflect. He was in the jail for 26 hours prior. 1243 AM and then we have this problem, what day of the month are we talking about? I thought that that when he checked into the cell, Atkinson, White, and Jensen were on the night shift. And about two hours later, he vomited and they cleaned him up and he said, I don't need any medical attention. And then on through that night, which included the seizure at 332 and the vomiting and defecation at 552. And then the nurse saw him the next morning. And then the following night when they were again on the shift is when he ultimately died. You mean it was 26 hours before these three fellas, he wasn't in the jail for 26 hours before they saw him, was he? Your Honor, I believe the record reflects that he was booked. He was taken somewhere. We had to have the fit for confinement letter. That may have taken a day, but it was a day when he was not in the presence of these defendants. I don't understand the relevance of that day if you're right on the custody versus jail custody. Your Honor, and I would be happy to refer back to the record and provide supplementary documentation to the court. I didn't study the record. I went off what the briefs taught me. That's all I do before argument. Now I know what to go look and do harder. Understood, Your Honor. So, and maybe if it's helpful to the court, I would like to review a few of the facts because it does seem like it's gotten a little bit muddled with all of the briefing. I have a fundamental problem because about the district court's analysis, and I may have read court's opinion too fast, but I thought this was a summary judgment record. And the district court in denying qualified immunity said, well, the facts could show that the county defendants would have known about that asthma and drug withdrawal are serious medical needs. Well, facts could have shown they should have been in the summary judgment record. Was it, was the court somehow expecting this to go to a second round of summary judgment or what? Have I misread what the court was, the court's analysis? Well, and I believe that's one of our primary issues on appeal here is that, you know, first and foremost, when the court considered this, they considered not only our summary judgment record, but they considered the medical defendant's summary judgment record as I don't think you want to go there. I think at least for me, you better the record that we have. And that's a, that's a dodge. It may be a good dodge, but my question was more, what was the record on what the, what these since we're talking about individual 1983 liability, what did they know about the, whether asthma and drug withdrawal are always, sometimes, or never a serious medical need? Well, I think it's a very fact specific question there, because when you look at the record as to what the exact, exact information the defendants knew, the only thing that was suggesting that it was the non-moving parties that had some burden to put in the record. For example, seizure. Nobody defines what a seizure is. Everybody says seizure. Well, I'm not, I'm no medical person, but I, you know, I know that there are all different kinds of seizures. The, the, you know, our case about our Barton case is irrelevant because it between secondhand smoke and seizure is a very specific thing. What do we have here? He slid off the bench. Somebody called, apparently White called it a seizure. Everybody calls it a seizure, but whether that equals a serious medical need, what's the, what's the evidence on this? I would agree with you, your honor. There is no evidence. There is no, there's, there's only a lay person. What's the evidence that it isn't always a serious medical need? Well, I think that there's a distinction between looking at it as a grand mal seizure and looking at it as a seizure-like symptoms that a lay person is observing. It put him on notice. I had a grandmother with grand mal seizures who was institutionalized back with what, that's what she did with that problem, that condition. That's not every seizure in the world and it's not the way those are, are treated today. So is this, the district court's just then at the end of the trial, we renew the, we renew the qualified immunity and we go through this again. It strikes me as quite, quite inefficient. I would agree with you, your honor. Your honor, I... Well, then we gotta have, I still don't know what's in the record. I don't believe that there's anything in the record supporting a seizure. I don't believe there's anything in the record supporting our officers knew anything about asthma or observed the vomiting or the defecation to be anything more than common lay person symptoms. It was a symptom of drug withdrawal. It was a minor symptom of drug withdrawal, and it didn't put them on notice that their actions would constitute deliberate indifference. Counsel, what about the... Go ahead. Go ahead, judge. What about the fit for confinement letter and what's the record show about your client's knowledge of his need for asthma medication and what did they do about it? The record indicates that our clients knew that there was a fit for confinement, that he had been evaluated by a hospital and deemed fit for confinement. The record does not reflect that any of the officers testified. They had no knowledge of what it actually included. I would clarify as well that the asthma specification in the fit for confinement was an as needed basis and our officers testified that had he actually requested the asthma inhaler, he would have had it in less than a minute. Isn't that every four hours? I'm sorry? The albuterol had an every four hours and the other meds were as needed, right? No, I believe the albuterol inhaler was as needed every four hours. So he would actually request it. Your honors, I apologize. I have two minutes left and I'd like to reserve them for rebuttal if you have no further questions. Well, I do and I wonder if we could let counsel have an extra minute or two for my question. Is that all right? Judge Loken? Judge Loken? Oh, fine. Yeah. I just, I want to, did not the district court assume that the officers had read the information in the fit for confinement letter and other documents? And if so, aren't we bound on this procedural posture of the case to deal with what the district court assumed, whether the record supports it or not? Your honors, I don't, I don't. That's a qualified immunity standard, isn't it? What this court found or what it assumed to be the facts unless blatantly contradicted by the record. I believe that the court has the ability to look at the record as a whole. I don't know that they're necessarily bound by the facts that the district court found, but I think, I don't know that there's anything supporting the assertion that the officers actually read the fit for confinement or that the district court assumed that they had read the fit for confinement. I apologize if you don't know offhand. Thank you very much. Thank you, Judge Loken. Oh, sure. Your honors, may I proceed? Very good, Mr. McPhail, please do. May it please the court. My name is Pat McPhail and I represent David Ivey, the respondent above, plaintiff below. You know, judges, I was, I had a kind of, I guess, summary of the argument I wanted to start off with, but I think that the issues that are really at the heart of this case were brought up in the appellant's brief. And so, I just want to take care of a couple of them. The first one, it's causation, right? So, what would have happened if the officers had actually relayed what they saw to the medical professionals as they were ordered by their supervisors to do so? If they would have actually done that, well, what would have happened? That is purely causation. You said, I thought the supervisor just said, you know, he should see the nurse, which he did when she arrived the next morning. What is in there in the record that they were instructed at 4 a.m. or 6 a.m. to do it now? It's in the same note from Officer White, who was the one who observed the seizure and fell to the floor. And I can pull it up for you, your honors. And I'll get you that exact citation. Hold on one moment, if you'd like that, or I can just wrap up the causation thing that I was about to say. Causation is not an issue for qualified immunity. You're relying on White's note as to what the supervisor told him? Yes. Okay, I can read that. Go ahead. Okay. And that's what he was told by the supervisor. Listen, you have to tell the nurse what you saw. And that's what our case is about. If they would have just told the nurse what they saw, this man is defecating on himself, he's puking on himself multiple times. Whether you call it seizure-like symptoms, that is not okay. You can't just have a person become unresponsive, slide off the bench, and not respond to the officers. And your case support for that? Yes. Well, we've cited multiple. That that's clearly established that whatever happened at 1 a.m. or 3 a.m. or 5 a.m. was clearly established. They had to run to the night nurse. Sure. And honestly, I think that if they would have just followed up.  Oh, case site. McRaven. I'm not asking for your argument. I'm asking for your best case. I'm clearly established. I believe McRaven, Your Honor, is probably the best one to start off with because you know, the 8th Circuit has addressed McRaven versus Grayson in the Barton case, right? We're not looking for something that has to be the exact factual scenario. But what we do need to look at is someone who is experiencing these obvious concerns of intoxication. McRaven is the one that is the easiest comparison. And the citation to that one, Your Honor, I'll get you the exact citation. I know it's cited. So in that one, Your Honor, what those officers witnessed was poor coordination, slurred speech, a flushed skin and droopy eyelids, and his blood pressure and temperature were down. They also were aware of a drug screen in that case that showed the person was under the influence of drugs. They did not tell the nurse anything about that. What happens is the nurse comes in. Which night are we talking? The first night or the second night? Yes, this is the first night. So I also looked that one up, Your Honor. Where did they know about the drug screen? Well, the drug screen is right at the beginning. That is from the Fit for Confinement report. He was found fit for confinement as a result of his drug intoxication. That's why he had to be taken to the emergency room in the first place. He was given a standard medical questionnaire. And to clear up the timing, that questionnaire, whenever he got into the jail, was 1302 on the afternoon of 7 July. I can read the report. I don't want to occupy your whole argument with one of many factual. And that's really the key here. When we're talking about whether it's a serious medical need, that is a question of fact. That is up to the jury. So the jury goes and says, OK, well, would a normal person, would an average layperson look at a person who just defecated all over himself and vomited all over himself and slipped off, had a seizure, was unresponsive? Would they consider that to be a serious medical need? The question of whether it's clearly established is separate from the serious medical need. That's why we're relying on McRaven. That's why McRaven, whenever these, what I would consider much less, I guess, serious symptoms when we're talking about slurred speech versus defecating all over a man. This isn't a high standard. All we're asking these folks to do is just tell the nurse, tell medical. Whenever you see someone have a seizure, if you think it's a seizure, pick up the phone. That's what we're asking. What would have happened if the report had been made? What's your proof on that? So, Judge, the actual doctor who is in charge here says, listen, and we put it into our briefing, well, maybe I'd start to think we can't take care of this man. We have to send him to the hospital. But what's really key there is that is causation. Under the qualified immunity analysis, what would have happened, that's irrelevant here. All that the court has to do is decide whether there was a constitutional violation, whether it was clearly established law. There's no, the court can't even consider the causation element that was brought up there. But there is evidence in the record that we've went through the summary judgment motion. The nurse says, yeah, I want to know about this. The doctor says, well, we wouldn't have been able to care for a man that's under that sort of sickness. The quotes are in the briefing. But that's not an issue on appeal here. This is just the qualified immunity analysis. But I mean, if there was no damage, does that not mean there was no violation that's actionable and therefore, is that question not before us? No. No, Your Honor, and I think that that's a separate issue too. Damages. Damages are not at issue here. But the damage here is death. I mean, injury. Forget damages. Injury. Sure. The injury is death. They didn't take, the nurse and the doctor couldn't take care of him because they didn't know what his symptoms were. We don't know that he would not have died. Anyway, what's your proof that he would have died, would not have died? Yeah, we have. The plaintiff has an expert in this, Your Honor. I'm sorry, with this back and forth, I don't mean to cut you off. No, it's fine. The plaintiff has an expert in this case that said all of these symptoms are readily treatable in the hospital setting. That we have, we have expert testimony to take care of all that. But that's not, that's not an issue at appeal here. We, we put it in our brief just to respond to the arguments that were made. But the court, that's not something that the court should get hung up on because that's not qualified immunity. Your Honor, I'm happy to take some questions on where, where the, you know, the big issues are here. But I think it really just comes down to whether it was clearly established that when you see someone that has these kinds of severe medical problems and you don't tell medical personnel, is that a violation of clearly established rights? Is McRaven the case that, where the medical personnel are the defendants? Because that's hard. No, Your Honor. McRaven, they, they might have had additional medical personnel in there. But the issue for qualified immunity is, is for the officers like here. Because the medical professionals don't have qualified immunity. The, the outside folks... Of course they do. The, the private... They have individual immunity. The, the private... Medical, the medical defendants here didn't appeal. They did not. And we argue... They have a right to qualified immunity. They may not, they may not deserve it here. Okay. Well, the, the issue at the McRaven case was the officers. What the officers told the nurse. And that was nothing. They didn't tell them the proper information that they knew. And then the nurse... They talked to the nurse, but didn't tell, didn't provide the right information. Exactly. And then the nurse actually... Now what's, now what's the case from anywhere in the country, where at 3, 4, or 5 a.m., qualified immunity is denied because the officers did not, did not call a night nurse. Waited for the medical officials in the next morning to, to examine the, the inmate. Well, your honor, I don't have a case citation for you there. I don't think it's necessary in this case. Because they didn't even tell the night nurse whenever they came on duty. So it wasn't just, they didn't call it at the time. That's the question. I mean, night nurses are, are there, are, you know... Well, in this case, your honor, also there is a, not a night nurse. It's a doctor that's on call. So they call, they actually call the, the, the physician. If they have to call someone. Or they can call 911. But the issue is the nurse comes and there's a jail nurse that's there every day. And they didn't tell her either. They did nothing. Well, your, your briefs, my notes from your brief says that night, site nurse testified with one and all about seizures. That's the site nurse. She's not overnight. The night, the night call that they could have called was doctor or 911. There is an on-call doctor. And there's also 911. And then you can tell the site nurse whenever she comes in that day, which what they were ordered to do. They did none of that. And, and that's the key. So the real question, what we got to ask is, well, what would a reasonable person, what a reasonable officer know that what they were doing was violating their rights? Well, what, what evidence do we have of that? Their supervisor told them. Officer White put in his report. Well, I was told I need to tell the nurse whenever she gets in. A reasonable person would know that that's what their duty under these circumstances. They didn't do that. The other two officers readily admit that they never talked to the nurse at all. So what's the connection between what a reasonable person would do and the issue here, which is, I gather, deliberate indifference. Would a reasonable person know that they were violating the person's rights? Right? And so we don't need to show that these officers had read the case law. You know, we don't need to know that. It does have to be clearly established. But that's, that's really the key. But it has to be deliberate indifference. Exactly. And in this case, it's. But the difference between, I'm sorry to keep interrupting you. No, no, no. There's a difference between negligence, which it seems to me you're talking about, which is what a reasonable person would do, and deliberate indifference, which is something akin to criminal recklessness, some of our cases say. Right. Would a reasonable person know that their actions were violating the constitutional rights of the individual? That is what the question is for. Deliberate indifference doesn't have anything to do with it? Deliberate indifference is a separate issue. That's a fact question. That is the second. That's not in all ways. Not if the record shows that there's no possibility of finding deliberate indifference. Well, I don't, I mean, I'm happy to talk about it in this case, but I think the facts in the case are that they didn't do anything. They're not doing something that isn't necessarily deliberate indifference. You have to know that you have to draw the inference that there's some untoward circumstance, serious character that's going to occur, and then deliberately ignore the inference. Right. And I think that that's exactly what we put before the court. That's what the court assumed. Those were the facts the court assumed. And so whenever you are in that position where the court goes, uh, you know, if it is as what the plaintiff says it is, that is, they looked at this man. He has, he's defecating all over. Counsel, is it relevant that just a matter of hours before the, as you call it, the fluking and the defecation, he had been released by an emergency room as fit for, you know, sleep it off or whatever you want to call it, his drug withdrawal problems? I think it's absolutely relevant. And that we're getting into. Yeah. And it points against deliberate indifference. Why does he have to call, look for the doctor on call or call 911 when an emergency room has just released this, this fellow, uh, for, to, to their custody. And judge, that sounds like. The fact that he throws up, you know, from intoxication, he's not the first one, he's not the first one in a, in a nice, you know, a jail to do that. Sure. And I think that's a great closing argument. Oh, sorry. Counsel, isn't it because the facts have changed? I think that that's a great, that's a great point also judge, but what we're talking, the fact that we're having this conversation over a factual dispute shows us exactly why summary judgment was denied. This is the basis for the, for more, many more than half, probably 90% of the serious medical need cases that we've decided on the basis of qualified immunity in the 20 some years we've, I've been dealing with these issues. It has to be consistent. Sure, there are facts. And people that don't like qualified immunity, they're the same people that don't like summary judgment because they want to get their case to trial. And that's understandable, but that's not what the Supreme Court has said is the basis for our review of these cases. Sure. So qualified immunity though, judge, whether that's constant, whether it is clearly established is, is that's the legal, that's the legal question. The fact, the factual question, we get to go up there and put our case on, we get to go up and say, well, yeah, they saw X, Y, and Z. They saw him defecate on himself. They saw him have a seizure. And then the other side gets to come up and say, well, before, you know, before that, before they, they said he was okay at the hospital or he was fit for confinement. And like Judge Gratchis said, well, the, the response to that is, well, circumstances change. You have to inform the judge. And I see I'm out of time. Your honors can, can I just finish that right there? Sure, sure. It's a, that's a, that's a great point. Circumstances change all the time, but what it comes down to is, listen, you, this is, this is the classic McRaven versus Grayson. Whenever you have, you point that out in, in the Barton cases, that shows exactly what we're talking about here. The Grayson case, the defendants are relying on. Okay. That's not wrapping up. They're getting on there. That's, that's what they're getting to. So we'll just look at how we looked at it in Barton. I think we'll get to the right point if we look at it in Barton. And I appreciate your time, your honors. Thank you for leaving me a few extra seconds. Very good. No, no, that's, that's what we're here for. Ms. Bates, you have a comment on this rebuttal? Yes, your honor, I, there's my time. Thank you, your honors. I just have a couple of points. And first and foremost, we need to look at this. Counsel ignores the, first and foremost, the first problem of qualified immunity, which requires a constitutional, which requires an examination as to whether there was a constitutional violation at all. And second of all, I, I really think that it's important to stress the standard that we need to examine this under. It's a criminal recklessness standard. It's not a negligence standard. So you're requiring a highly culpable state of mind, borderline intent as to what the officers did to, to aid or help or did or do not do to aid or help Mr. Ivey here. And based on the circumstances that they faced, I really do think it's important to look at the timing of the events. The instances of vomiting and the defecation occurred almost a full 24 hours prior to Ivey, Ivey's demise. So, I mean, there's, there's a huge timing issue that I think it is extremely important to look at with the court. And the bottom line is, is it's not, qualified immunity is not based on hindsight. So what if these officers would have told, you know, the nurse this, would they have put him in a hospital? These are all what is, and we don't have that benefit in qualified immunity. Our officers don't have that benefit. They have to look at the circumstances that they're faced. An officer right was told, make sure you see the nurse. And he made sure that that person saw the nurse. Whether or not the information was relayed, okay, that might be, you know, a fact issue, but it's not a material fact to find a deliberate indifference or not. Um, the bottom line is, is that Ivey saw the nurse and then the officers came on shift seven, 12 hours later after they knew he had already been attended to by the nurse. And they watched him carefully that second night, so carefully that they could see the rise and fall of his chest on a video camera and immediately responded when they noticed that it wasn't okay. These officers were, did everything that they could under, as required by the law, under the constitution, and they should be afforded qualified immunity. Thank you, Your Honors. Thank you, Counsel. You have covered well that we, we struggle in these qualified immunity cases all the time with, with facts versus law. We never stopped struggling even with each other on it. And you have, you have struggled well and helpfully. You've told us where to go to try to sort this one out. And, and also with the, with our new technology, it's, it's worked, it's worked quite better than just sufficiently. It's been helpful. And we'll take a case under Biden.